# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

REBECCA A. CRANDALL,

      Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

No. C06-3015-PAZ

**MEMORANDUM OPINION AND ORDER**

_____

## I. INTRODUCTION

The plaintiff Rebecca A. Crandall ("Crandall") seeks judicial review of a decision by an administrative law judge ("ALJ") denying her application for Title XVI Supplemental Security Income ("SSI") benefits. Crandall claims the ALJ erred in presenting an incomplete hypothetical question to the Vocational Expert, improperly determining Crandall's residual functional capacity, improperly finding Crandall's subjective complaints not to be credible, and failing to give proper weight to the opinions of the medical professionals regarding Crandall's condition. (*See* Doc. Nos. 10 & 12)

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On August 14, 2002, Crandall protectively filed an application for SSI benefits, alleging a disability onset date of June 30, 1987. Crandall claims she is disabled due to back pain caused by a vertebra in her low back that she describes as "push[ed] forward and . . . kind of smushed looking[.]" (A.R. 90) She claims she is unable to work due to her inability to lift over twenty-five pounds, problems bending over or repeatedly bending up

and down, and difficulty walking or sitting for long periods of time, Crandall's application was denied initially and on reconsideration.

Crandall requested a hearing, and a hearing was held before ALJ Jean M Ingrassia on January 19 and February 14, 2005.[1]  Crandall was represented at the hearing by attorney Blake Parker.  Witnesses at the hearing included Crandall; Deborah Perry, a friend of Crandall's and her pastor's wife; medical expert Dr. Philip Ascheman, a licensed psychologist; and Vocational Expert ("VE") Roger Marquardt.

On July 8, 2005, the ALJ ruled Crandall was not entitled to benefits.  Crandall appealed the ALJ's ruling, and on January 12, 2006, the Appeals Council denied Crandall's request for review, making the ALJ's decision the final decision of the Commissioner.

Crandall filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling.  On March 24, 2006, with the parties' consent, Chief Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. Crandall filed a brief supporting her claim on June 22, 2006.  The Commissioner filed a responsive brief on August 14, 2006, and Crandall filed a reply brief on August 21, 2006. The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Crandall's claim for benefits.

## B.  Factual Background

### 1.    Background facts and hearing testimony

Crandall lives in Fort Dodge, Iowa, with her four children, who at the time of the hearing were ages 17, 14, 10, and 6.  She is separated from her husband, and he

_____

[1]The first hearing ended when the video link was lost between the hearing officer's and the claimant's locations.  The supplemental hearing was convened to allow Crandall's attorney the opportunity to question the Vocational Expert.

sometimes pays child support. She began receiving State assistance in August 2004, after her separation from her husband. Prior to that time, her husband supported the family.

Crandall worked part-time, off and on, after her alleged disability onset date, but never at the substantial gainful activity level. She has worked as a school bus aide for Head Start, a teacher's aide, and a child care attendant, and has done some volunteer work at a thrift shop.

Crandall testified her back pain has worsened over the last five years to the point that she has difficulty caring for her home and her children. She has a driver's license but stated she has difficulty getting in and out of her car, and she has trouble driving if she is required to twist around to see behind her. She drives her ten-year-old child to school every morning, but a neighbor picks the child up from school in the afternoon. Any kind of bending or twisting motion causes her extreme pain. She indicated her three oldest children help out with housework. Crandall's house has four bedrooms and two bathrooms on two stories. She stated she has to clean the house in sections, sitting down and resting in between chores. It takes her two days to clean her house, not including the children's bedrooms, which the children clean themselves. She estimated it would take her only three or four hours to clean the house if she did not have back problems. On occasion, when she has bent down to clean something like the bathtub, her oldest child has had to help her get up off of the floor because Crandall was in too much pain to get up by herself. She stated her children help with the vacuuming, cooking, dishes, sweeping and mopping floors, and laundry. Crandall helps them with the laundry but she seldom carries laundry. She sits on the floor and sorts clothes, or puts clothes into the washing machine. If she takes wet clothes from the washer to the dryer, she moves very slowly to keep from twisting her back. She sometimes gets muscle spasms in her back, and she will have to stop whatever she is doing to allow the pain to subside before she can continue.

Crandall's last full-time job was in 1996. Her youngest child was born after she quit working, and she acknowledged that part of the reason she did not return to work was her child care responsibilities, but she indicated the primary reason was that she had a great deal of difficulty just managing her daily activities.

At the time of the hearing, Crandall was thirty-seven years old, a little over 5'3" tall, and weighed about 245 pounds. She indicated she had gained thirty to forty pounds since she filed her application for SSI benefits in 2002. She attributed her weight gain to inactivity and a tendency to eat a lot when she is depressed.

Crandall indicated she had a substance abuse problem in the past, but she no longer abuses alcohol or other drugs. She graduated from high school with a C or D average. She has problems with reading because she is unable to sit and concentrate for long. If she sits in a chair with a cushion in it, she can sit for a little longer than she can sit in a hard chair. If she sits for very long, her tail bone starts to hurt and the pain radiates up into her back.[2] She described the pain as "really sharp" at times, while at other times the pain is more of an aching or a throbbing. On a ten-point scale, she estimated the pain will reach a five or six if she sits for very long on a hard chair. After sitting for a long time, she will have difficulty getting up. She will have to move very slowly for awhile before she can straighten up all the way. When she is at home, she sits on a soft chair with her feet elevated. She uses a foot stool that is at the same level as her chair, because if her legs are lower or higher it causes her back to hurt.

Crandall stated that when her pain becomes unbearable, she takes hydrocodone four to six times a day. She takes Tylenol and Ibuprofen on a regular basis. She tries to limit the amount of hydrocodone she takes because the medication makes her groggy and causes her to have difficulty concentrating. According to Crandall, she has a blood clot in her leg

---

[2]The court notes Crandall changed position from sitting to standing during the ALJ hearing. *See* A.R. 607.

that prevents her from taking "arthritis medication," so she only takes the amount of anti-inflammatory medication that her doctor has approved.

In addition to her back pain, Crandall also experiences pain in her legs, primarily in her upper thigh, radiating to the front of her pelvis and around to her lower back. She has difficulty lifting her legs up to get dressed and she must sit down to put on anything from the bottom up. She is unable to cross her legs without assistance, so when she is wearing a dress and sits down, she has to lift one leg up with her hands to cross it over the other. Walking, getting in and out of her car, and lifting her legs all cause her legs to hurt. She estimated she can walk around the grocery store for fifteen to twenty minutes, leaning on a grocery cart. If there is a wheelchair or electric cart available, she uses them to do her shopping. She stated she does not even attempt to walk around a store without at least a cart to lean on.

Crandall sees Randy Minion, M.D., a family practitioner, for her back and leg pain. He sent Crandall to see neurologist Mark Palit, M.D., who, according to Crandall, indicated surgery might help Crandall's pain. However, Crandall stated Dr. Palit further indicated there would be a long recuperation period following the surgery and he was uncomfortable going forward without a second opinion. For the second opinion, Crandall saw Daniel J. McGuire, M.D. Again according to Crandall, Dr. McGuire stated the consequences from back surgery would be more severe, in Crandall's case, than her symptoms without the surgery. It is Crandall's understanding that she suffered a slipped vertebra when she fell during her first pregnancy, and the condition worsened over the years as she had more children, re-injured her back, and suffered consequences of aging, including the onset of arthritis in her back. Crandall testified doctors have explained that her leg pain is due to muscles and nerves attached to her spine being out of place due to the vertebra that has slipped forward.

Crandall was referred to a pain clinic, where Marco C. Araujo, M.D. administered steroid injections to Crandall's low back. According to Crandall, Dr. Araujo indicated her MRI study was normal, and he opined she has arthritis in her back. Crandall was

experiencing numbness and tingling in her left side, down her leg and into her foot. Two to three weeks after she had the injections, these symptoms subsided and her back pain improved. She has had injections on three occasions, experiencing short-term relief on each occasion for perhaps a month at a time. According to Crandall, doctors have told her there is no long-term cure for her ongoing pain.

Crandall stated her pain affects her concentration and limits her activities. She has a six-year-old son and she is unable to play actively with him outdoors. She can sit in a sandbox with him for a short time or kick a ball a few times but she cannot do more. She cannot go hiking with her older children. She does not take long trips because of the prolonged sitting. Crandall also is unable to sit through a movie or an entire church service without getting up to move around due to pain. The hydrocodone makes her groggy and affects her ability to concentrate. Her two older children often watch their two younger siblings because Crandall will fall asleep sitting in her chair.

Crandall stated she cannot use her hands for a prolonged period without creating muscle spasms in her mid-back. She uses a heating pad to lessen the pain from the muscle spasms. She does very little lifting. Her children carry groceries in from the car, lift milk containers, and carry heavy dishes to the table. Crandall also stated pushing and pulling motions cause pain in her back.

In addition to her physical problems, Crandall also has been treated by psychiatrists and psychologists for mental health problems. She has been hospitalized due to mental health issues eight to ten times during her life. She was hospitalized in 2003, when she became depressed, unable to sleep, and overwhelmed due to marital problems. At the time of the hearing, she was seeing a therapist through Catholic Social Services, and Dr. Minion has prescribed anxiety medication for her. Crandall stated her depression makes her want to sleep a lot and prevents her from coping well with day-to-day stresses.

She indicated her marital problems cause her a lot of stress and contribute greatly to her depression.

Crandall volunteered for awhile at her church's thrift shop. She helped sort clothing and arrange items in the shop, but the lifting caused her back to hurt and interfered with her ability to sleep at night. She still occasionally assists at the thrift shop watching the cash register, but only for short periods of time, and she no longer does any lifting or sorting. She stated the church provides her with a soft chair to use when she is volunteering, but she still has to get up and move around frequently. She can only volunteer for a few hours at a time because of her need to lie down and rest.

Deborah Perry is a friend of Crandall's and her pastor's wife. Perry has completed her associate's degree in nursing. She testified at the hearing regarding her personal observations of Crandall. Perry plays the organ at the church so she sits at the front of the sanctuary and can observe the congregation. She has observed that Crandall is unable to sit through the church service and will get up and leave the room two or three times during each service. She stated that when Crandall is sitting, she fidgets constantly and appears to be uncomfortable.

Perry also has observed Crandall doing volunteer work at the church's thrift store. She stated Crandall does not do much volunteer work anymore, but about a year prior to the hearing, Crandall was able to help sort items that were placed in front of her. By the time of the hearing, Perry opined Crandall would be able to watch the cash register for up to two hours if she could change position as needed. She has observed that Crandall "has to shift from side to side, [and] get up and walk at least five to ten feet away from the area she's at and move and stretch." (A.R. 622)

Perry has observed that Crandall's demeanor changes when she is on her pain medications. She stated Crandall's ability to concentrate is affected, and when Crandall

is at the thrift store, other volunteers help her and watch her so she does not make mistakes with the cash register.

## 2. *Medical expert's testimony*

Dr. Philip Ascheman testified solely based on his review of Crandall's medical records and from listening to her hearing testimony; he has never examined Crandall. Dr. Ascheman stated the record indicates Crandall has a diagnosis of major depressive disorder recurrent with relatively brief symptomatic episodes followed by periods of remission when psycho-social stressors are eliminated. He noted she has gone for long periods with no apparent treatment. The record further indicates Crandall has some dependent borderline personality disorder characteristics, and a history of substance abuse disorder, primarily involving the abuse of alcohol. Dr. Ascheman testified that in his opinion, Crandall's mental impairments would result in only mild limitations of her activities of daily living and her ability to maintain concentration, persistence, or pace. He further indicated she might have brief difficulty remembering and understanding detailed instructions during one of her brief episodes of significant major depression. He otherwise opined Crandall would have no limitations as a result of her mental disorders.

Dr. Ascheman offered several opinions regarding the significance of Crandall's GAF scores from time to time, and whether her reportedly frequent inability to cope with her day-to-day activities would constitute "decompensation" for purposes of the Social Security regulations. On this issue, the court does not find the doctor's testimony to be particularly useful in the context of this case, particularly in light of the fact that he never examined Crandall and had never even met her prior to the ALJ hearing.

### 3.    *Vocational expert's testimony*

The VE listed Crandall's past relevant work as home health aide, a semi-skilled job with medium to heavy strength demands; child monitor, a semi-skilled job with light to medium strength demands; and school bus monitor, an unskilled job with little or no strength demands.  The ALJ asked the VE the following hypothetical question:

> Okay, I would like you to consider, please, an individual who is 37 years old with a 12th grade education, and very limited work activity outside of the home except for those jobs that you have indicated, and basically no real substantial and gainful work activity since about 1996.  Her major problem is a condition that has been diagnosed Grade 1 Spondylosthesis which affects her back, and which is certainly a major component of her back pain, a major cause, at least, of her back pain.  This impairment and pain that it projects would limit her ability to occasional climbing, balancing, stooping, kneeling, crouching and crawling.  She does perform those activities.  She indicated she sits in the sand box with her children, she does do some stooping, she does do some crouching, and obviously she does do some kneeling, however, she certainly would not be able to perform those activities repetitively.  She has no visual[,] communicative or environmental limitations.  Basically the record does not indicate any manipulative limitations.  Of course, she does have some exertional limitations, not [sic] doctor has basically indicated that she is physically limited in her ability to sit, stand and walk.  She should be able to perform those activities in an eight hour work day.  However, she should be allowed to alternate positions, at least get up, squirm, move about at least every hour.  She's been sitting at the hearing today, at least until 10:30, and hasn't moved again.  I assume she'll be getting up soon and at least stretching.  In terms of lifting, she should probably only occasionally lift 20 pounds and she should be able to lift 10 pounds.  With those restrictions, are there any jobs in the competitive job market that would accommodate them?

(A.R. 637-38)

The VE responded that the hypothetical individual would be able to perform Crandall's past relevant work as a school bus monitor and a child monitor. In addition, he indicated a counter clerk position would allow the individual to move around and change positions as needed. He further opined the individual could work as a room service waitress, a hostess, or a surveillance monitor.

Crandall's attorney asked the VE the following hypothetical question:

> I want you to consider a 37-year-old female, with a high school education, past relevant work pursuant to [the VE's summary], the person would have a history of low back pain as a result of spondylosthesis, a BMI of 40.7. She is a non-surgical candidate for back pain. In the past, she has had epidurals which have helped for about two months with respect to that back pain and then after that, there is no longer any residual effects from those epidurals. She's had physical therapy. She indicates to her medical doctors that the pain rating varies between 2 and 9 on a 10 point scale with indications [that] pain restricts her activities of daily living. She has a record of major depressive disorder since 1998. This results in not sleeping well at night, loss of appetite, crying spells, short-tempered even with minor provocations, difficulty concentrating, [and] she has a record of eight psychiatric admissions to the hospital. That creates a residual functional capacity for purposes of this hypothetical of an inability to do a combination of sitting and standing for no more than two hours secondary to the back pain, and can stand at most for 10 minutes due to back pain. She can sit comfortably for 30 minutes due to the back pain. After 30 minutes, she begins to fidget and becomes uncomfortable. She can't sit for longer than an hour at a time. An example of this is that the person could not make it through an hour of church service without the need to get up and leave. An inability to concentrate secondary to depression, crying at unexpected times, limited contact with co-workers due to an inability to control her emotions, and no more than occasional contact with supervisors due to becoming angry without provocation. Is she capable of returning to any of her past relevant work?

(A.R. 643-44)  The attorney clarified that the hypothetical individual would be able to do a combination of sitting and standing for up to two hours, and then she would have to lie down for perhaps fifteen minutes before she could return to work.  After the rest period, she again could sit and stand, in combination, for up to two hours.

The VE stated the hypothetical individual would be unable to perform Crandall's past work.  In addition, he indicated no competitive employment would allow someone to take a break every two hours to lie down for fifteen minutes.  However, if the only restriction was that the individual had to take a break every two hours, without the need to lie down, then he opined there would be jobs that could be performed including office machine operator, library aide, and mail clerk.  Adding in the remaining limitations, however, would preclude all competitive employment.

The VE also considered some of the limitations in the hypothetical individually.  He indicated crying at unexpected times and the inability to stand for more than ten minutes at a time would preclude Crandall's past relevant work.  He opined that having only occasional contact with co-workers or supervisors still would allow the individual to work as a child monitor, school bus monitor, or home health aide.  However, if the individual could have only occasional contact with the public, she would not be able to work as a school bus monitor.

The VE stated the hypothetical individual would have no transferable skills.


### 4.     *Crandall's mental health history*

The record indicates Crandall had a significant problem with substance abuse, primarily alcohol and some cannabis, beginning in her teenage years and continuing into adulthood.  It appears that by June 1992, when she had a psychiatric evaluation, her chemical dependency was in remission.  (*See* A.R. 164)  The evaluation indicates that by 1992, Crandall had attempted suicide twice, once by overdosing and once by cutting her

wrists, and had received care from two psychiatrists. She was being seen at that time for individual counseling to help her deal with ongoing marital problems. Doctor's notes suggest Crandall could benefit from vocational rehabilitation training, noting Crandall "had been very inconsistent in her jobs and usually [would] quit working after two weeks." (A.R. 167)

Crandall was hospitalized with diagnoses of suicidal ideation and probable alcoholism on December 29, 1992. She was angry and uncooperative, stating her mother had called the police to bring Crandall to the hospital. Crandall admitted to drinking a bottle of schnapps the previous day. She was released on December 30, 1992, with a prescription for Prozac. At a follow-up appointment on April 8, 1993, Crandall reported "remarkable improvement in her depression" on the Prozac. She was sleeping well, had more energy, and stated her family had noticed a difference in her. She was attending 12-step meetings and abstaining from alcohol.

In April 1994, Crandall gave birth to a son. Her Prozac apparently had been discontinued during her pregnancy and Crandall became increasingly depressed. On October 14, 1994, Crandall attempted suicide by overdosing on a Soma compound. She stated she had taken fifteen to twenty pills with one drink of alcohol; however, her blood alcohol was negative and no pills were found in Crandall's stomach, although she was drowsy upon admission. Crandall stated her new baby was ill and in the hospital and she was feeling a great deal of stress. She remained in the hospital until October 19, 1994, when she was discharged on Prozac. Her discharge diagnoses included major depression, recurrent; alcohol abuse; borderline personality traits; and moderate stressors with marital dysfunction.

Crandall was seen in the emergency room on February 9, 1997, with complaints of stomach upset and vomiting if she ate anything. She stated she had been unable to eat for one week, and she had been able to drink very little. Doctors planned to treat Crandall

with a "GI cocktail" and discharge her on Pepcid.  However, notes indicate Crandall's husband "caused a considerable disruption in the emergency department," demanding that Crandall be admitted.  Doctors decided that due to Crandall's apparent anxiety, she should be interviewed by a psychiatric nurse.  When Crandall's husband learned of this, he "had a fit" and threatened the doctors, nurses, and hospital staff.  He was directed to leave the hospital, and was told that if he returned, they would call the police.  Mr. Crandall left and then returned, continuing his threats and allegations, but he left again before police arrived.  Doctors opined that Crandall's medical problems were due to "some superimposed anxiety."  She was admitted for further evaluation, and was treated with oral Prilosec.  She became able to eat and calmed down considerably, and she was discharged the following day on Prilosec.  Notes indicate Social Services was involved with the family due to problems within the Crandall home.

On January 20, 1998, Crandall had an altercation with her husband and she left the home.  She was found "walking around town in the cold and snow in an Iowa winter from 6 o'clock in the morning until approximately 7:30 in the evening."  She was cold, wet, shivering, and possibly hypothermic.  She was treated with IV warm saline and warming blankets for about two hours.  Once her condition stabilized, she was discharged.  She agreed to enter an outpatient treatment program for diagnoses of major depression; personality disorder, mainly with dependent traits; and alcohol dependency.  Richard Ajayi, M.D. evaluated Crandall and prescribed Prozac again, given Crandall's good response to the drug in the past.  Treatment notes indicate Crandall was planning to open her own day care.  She indicated she enjoyed skating and outdoor activities but had stopped them "because of loss of interest."  She set treatment goals of building her self-esteem and becoming more independent.  She did well for the next couple of months, attending individual and group therapy sessions, taking her medications, and remaining abstinent from alcohol.  She continued to report marital problems.  She saw a counselor

on February 12, 1998, for further evaluation and on February 19, 1998, to begin her individual counseling. Notes indicate Crandall denied any medical problems on both of these dates. On February 20, 1998, Crandall told Dr. Ajayi she was sleeping better, had more energy, and her concentration had improved somewhat.

Crandall attended therapy sessions on March 5 and 12, 1998. She was staying sober but continued to have problems in her marital relationship. On March 18, 1998, Crandall was taken to the emergency room by ambulance after drinking a bottle of peach schnapps and passing out. She and her husband had been involved in an altercation, and Crandall had superficial lacerations to her hand and bruising on her left wrist. At the hospital, Crandall was vomiting and she could not remember what had happened or where she was. Dr. Ajayi was called in for a consultation, and Crandall stated she had stopped taking Prozac on her own. The doctor directed her to resume taking Prozac, and Crandall was discharged once her condition was stabilized. Crandall and her children spent the night in a motel, and at Crandall's therapy session on March 20, 1998, she discussed going to a domestic abuse shelter. She agreed to undergo evaluation for concentrated substance abuse treatment. A staffing report from the treatment program dated April 6, 1998, indicates Crandall had been making good progress until the domestic assault by her husband. She was advised to continue with her treatment program.

The next record of mental health treatment for Crandall is almost three years later, on March 1, 2001, when she was evaluated at North Central Iowa Mental Health for symptoms of depression secondary to marital problems. She was diagnosed with Major Depressive Disorder recurrent, moderate; Alcohol Dependence in remission; and Personality Disorder, not otherwise specified. Uzoma C. Okoli, M.D. prescribed Celexa. By May 9, 2001, Crandall was sleeping better, her appetite was improved, and she reported that things were going well with her husband.

Crandall returned to see Dr. Okoli in April 2002, stating she had just returned to the Fort Dodge, Iowa, area from Des Moines, Iowa, where she had moved with her husband. She was involved with DHS supervision regarding her children, was separated from her husband, and was feeling depressed and having sleep difficulties. She stated she no longer drank alcohol. She was restarted on Celexa. On May 8, 2002, Crandall was evaluated by a social worker from Catholic Social Services for symptoms of depression and a history of physical abuse by her father and husband. Crandall had separated from her husband, and she continued to take Celexa for depression. She reported difficulty falling asleep and sleep disturbances. A twelve-month program of psychotherapy and education was recommended.

Crandall saw Dr. Okoli for follow-up on May 17, 2002, and reported some improvement in her feelings of depression, although she continued to have problems sleeping. Dr. Okoli prescribed Ambien for her insomnia. Crandall missed her appointment on June 26, 2002, but called later to report that she was at the domestic shelter. Dr. Okoli saw her for follow-up on July 3, 2002, and Crandall stated she was not depressed. She was getting along well with her children, and she was sleeping much better, noting she had only taken the Ambien twice. She was continued on Celexa. Crandall missed her next follow-up appointment on September 4, 2002. She next saw Dr. Okoli on September 25, 2002. She reported increased depression, crying spells, fatigue, and irritability. The doctor increased her Celexa dosage and warned her of the risk of relapse, recommending she continue her abstinence from alcohol.

At Crandall's next follow-up on October 16, 2002, she reported doing well and feeling better. She stated she had been sober for two years, which Dr. Okoli felt improved her prognosis. In November 2002, at the halfway point of her treatment, she was showing "remarkable progress." She had "very good ego integrity [and] ego strength" which her therapist believed would bode well for Crandall's ability to work. (A.R. 265)

On February 10, 2003, Crandall reported having increasing anxiety and agitation for about two weeks. Her husband had assaulted her and Crandall was staying at the domestic abuse shelter. She was staying sober and complying with her medications. Dr. Okoli added Lorazepam to Crandall's medications. On February 17, 2003, Crandall was admitted to the hospital with complaints of progressively worsening depression and thoughts of suicide. Crandall was noted to be extremely distraught and tearful. She reported feeling overwhelmed by ongoing conflicts with her husband, from whom she was separated, and her responsibilities in caring for her four children. Crandall stated she had been sober for two years. She stated she was no longer doing well on Celexa and had stopped taking it. Dr. Okoli prescribed Wellbutrin, as well as Lorazepam as needed to control Crandall's agitation and anxiety. He believed Crandall was at risk for self-harm due to the severity of her symptoms and her history of poor impulse control. Crandall was discharged on February 20, 2003, with improved mood and no suicidal thoughts. She was referred to the partial hospitalization program and also to individual counseling.

Crandall saw Dr. Okoli on February 24, 2003. She was still somewhat depressed but was not suicidal and was continuing to abstain from alcohol. The doctor increased her Wellbutrin dosage. Crandall continued to see Dr. Okoli every four to six weeks, each time reporting improvement and no new complaints. She became involved with a church and enjoyed the church activities and discipline. She was sleeping well and had a good appetite. Crandall's husband was in prison for the domestic assault and she did not plan to reunite with him upon his release. She continued to take Wellbutrin. In October, 2003, Dr. Okoli noted Crandall was "doing extremely well." (A.R. 455)

5. *Crandall's physical health history*

Crandall complained to her doctors of back pain at least as long ago as December 1991, when she reported having pain sitting or bending over. X-ray findings were

"consistent with bilateral spondylolysis at L5 and a grade 1 spondylolisthesis at L5 and S1 with muscular spasm." (A.R. 299) In March 1992, Crandall's doctor advised her to "avoid any type of employment that requires any lifting and straining." (*Id.*)

In February 1994, Crandall fell on the sidewalk, slipped, and hit her back. Doctors prescribed Tylenol #3 and a heating pad. In February 1995, she again was seen after a fall, this time down her stairs. She landed on her left buttocks and posterior thoracic region, and complained of pain in her back and neck, as well as headaches. She exhibited good range of motion throughout her spine, but some muscle spasm was noted in her lumbar region. She was diagnosed with a strain and muscle spasms and was treated with Cataflam and Flexeril.

In April 1996, Crandall was seen with complaints of right-sided back pain after moving some furniture. Doctors prescribed Flexeril and Darvocet for ten days. On July 15, 1996, Crandall was seen with complaints of back pain after slipping on some stairs at home. She was treated with Floricet with Codeine. At a follow-up on July 19, 1996, Crandall continued to report some discomfort. The doctor noted some muscle spasm in Crandall's lumbar region. Crandall was released to return to work as of July 22, 1996, or directed to return to the doctor if she still felt unable to work. On July 22nd, Crandall returned for follow-up, stating she had been doing better until she got in an altercation with her sister-in-law, reinjuring her back. She was advised to use caution when lifting, and was released to return to work.

More than four years later, on January 3, 2001, Crandall suffered an acute cervical strain when a car she was driving was rear-ended by another vehicle. X-rays were negative for any fracture or dislocation, and Crandall was treated for left-sided neck pain with 400 mg of Ibuprofen and a soft collar. On January 15, 2001, Crandall was referred to physical therapy to address ongoing neck and low back pain. She was treated with ultrasound, massage therapy, and stretching/strengthening exercises. She made excellent

progress and was discharged on February 23, 2001, after reaching her goals of being pain-free and having full range of motion. She was advised to continue with her daily exercises to maintain her fitness level and avoid further aggravation.

Crandall was seen on June 15, 2001, for complaints of right foot pain. She was diagnosed with plantar fasciitis. X-rays were inconclusive. Doctors prescribed orthotics and Lodine, and advised Crandall to get better shoes.

On August 12, 2002, Crandall was seen with complaints of low back pain that started the previous weekend while she was lifting some heavy boxes at home. Doctors noted some mild to moderate left paravertebral muscle spasm, and Crandall exhibited decreased lateral bend to the left. X-ray impressions included "Stage 1 spondylolisthesis and spondylolysis of L5"; "Degenerative disc disease of L4-5 disc"; and "Facet joint arthritis at the level of L4, L5, and S1." (A.R. 312) She was treated with Voltaren, and directed to return for a physical therapy consult if her pain continued. On August 19, 2002, Crandall reported her pain was not improved and it was difficult for her to sit down. Doctors prescribed Tylenol #3 and referred Crandall to physical therapy. Mark K. Palit, M.D. examined Crandall and diagnosed "Grade 1 spondylolisthesis at L5-S1 with bilateral pars defect." He started Crandall on Bextra, and prescribed "physical therapy for lumbar dynamic stabilization training," with follow-up in six weeks. (A.R. 339)

Crandall attended two physical therapy sessions during September 2002, during which she was instructed in an exercise program. Crandall stated she had had back pain for fifteen years, so she believed it would take awhile for her to experience any relief. The physical therapist scheduled Crandall for twice weekly sessions to work on strengthening her lumbar area. Physical therapy improved Crandall's symptoms, and by December 10, 2002, Dr. Palit noted Crandall was doing well. He prescribed Anaprex for any continued back pain. He noted Crandall should be able to return to work as long as she avoided bending, twisting, and any repetitive heavy lifting.

On March 4, 2004, Crandall saw Randy Minion, M.D. with complaints of right-sided neck pain. Dr. Minion noted Crandall had been in a motor vehicle accident three years earlier "with a fairly impressive whiplash injury." She had worn a cervical collar for two months and was treated with physical therapy, but she had continued to have pain episodically. At this visit, Crandall reported she had been having pain for about two weeks. It sometimes woke her up during the night, and she complained of occasional paresthesia and numbness in her arms. She also complained of pain when she coughed, and stated it was hard to lift her head off the bed when she was supine. X-rays were unremarkable. Dr. Minion's impression was that Crandall "probably has a chronic facet arthropathy that is aggravated from time to time by specific movements." (A.R. 409) He referred Crandall to a pain clinic for a facet joint injection. The doctor also noted that besides the neck pain, Crandall was a "healthy young woman who takes no medications chronically[.]" (*Id.*)

On March 30, 2004, Crandall was seen in the pain clinic with complaints of low back pain with left lower extremity radicular symptoms with numbness and paresthesia. She stated she had no neck pain at that time, but her low back pain was eight on a ten-point scale. She indicated the pain was alleviated by heat, massage, and medication, and worsened by walking, sitting, lifting, bending, and standing for long periods of time. She stated she drank alcohol occasionally and did not smoke. Marco C. Araujo, M.D. administered a lumber epidural steroid injection at L4-L5. He prescribed Hydrocodone as needed for pain. Crandall had further epidural injections on April 30 and June 23, 2004. She was advised to return for follow-up in three to four months.

Crandall underwent an MRI study of her lumbar spine and cord on March 24, 2004. Degenerative disc disease was noted involving the L4-5 and L5-S1 discs. Additional impressions included bilateral facet joint arthritis at L2-3 through L5-S1, most severe at L2-3 and L3-4; stage 1 spondylolisthesis of L5; and abnormal changes with bone marrow

edema consistent with discitis. Crandall underwent tagged imaging studies on April 6, 2004, to evaluate her for possible discitis. The studies were negative, showing no focal abnormal activity uptake or lesion in Crandall's spine, pelvis, or sacrum.

Crandall saw Dr. Palit on April 9, 2004, on referral from Dr. Minion, for evaluation of Crandall's low back pain, and pain and tingling in her left lower leg. Dr. Palit reviewed Crandall's MRI scan and x-rays and stated Crandall would be a candidate for surgical intervention consisting of decompression and fusion, most likely with pedicle screw instrumentation. He advised her that the surgery would take several hours and her recovery period could be as long as a year. He referred her to spinal surgeon Daniel McGuire, M.D. for a second opinion. Dr. McGuire evaluated Crandall on April 26, 2004, and found that given Crandall's current condition, the risks of the surgery would outweigh the benefits.

On July 28, 2004, Crandall was seen with complaints of migraine headaches. She was started on Midrin. Crandall saw a doctor on August 17, 2004, complaining of back pain, muscle spasms, numbness and tingling in both legs, and continued migraines. She stated the epidural injection's effectiveness had worn off, she could not get another injection for two more months, and she was in pain. She received Imitrex for the migraines, and Vioxx and Lortab for her chronic recurrent low back pain.

On October 8, 2004, Crandall was admitted to the hospital due to the presence of deep venous thrombosis. She was treated with anticoagulants, and her left leg swelling slowly improved. She was discharged on October 12, 2004, with a prescription for Coumadin.

On October 16, 2004, Crandall was taken by ambulance to the emergency room with complaints of the sudden onset of a left-sided headache the previous evening. She stated the pain was not like a migraine headache. She had taken Tylenol without relief. A CT scan of her brain was negative. She was given an injection and was discharged with

instructions to follow up with her doctor. She saw a doctor on October 18, 2004, for follow-up of her headache. She received an Imitrex injection.

Crandall received an epidural steroid injection at the pain clinic on March 3, 2005. In a questionnaire about her pain level prior to the injection, Crandall indicated she could not sleep in bed due to pain. On a ten-point scale, she indicated her pain interfered with her general activity, walking ability, normal work routine, sleep, and enjoyment of life, all at a level of 10/10. Pain interfered with her mood and her relations with others at a level of 3/10; her ability to concentrate at a level of 8/10; and slightly interfered with her appetite, causing her to eat more. Crandall opined she could function on a daily basis if her pain level was no more than 2/10.

On April 7, 2005, Dr. Palit completed a questionnaire regarding Crandall's condition at the request of the ALJ in this case. Dr. Palit indicated Crandall's grade 1 spondylolisthesis had deteriorated since he began treating her. He noted her prognosis as fair, and indicated Crandall was on a home exercise program, lumbar epidural steroid injections, and oral anti-inflammatories. He further stated Crandall is not a surgical candidate, as confirmed by Dr. McGuire.

On April 28, 2005, Crandall had another epidural steroid injection. Her pain and its effect on her daily life had improved, and she now rated her pain as follows: interference with general activity, mood, normal work routine, enjoyment of life, and ability to concentrate at a level of 4/10; relations with others at a level of 3/10; sleep disturbance at a level of 6/10; walking ability at a level of 7/10; and appetite at a level of 1/10.

## 6.   *Consultants' assessments*

On January 17, 2003, Dennis A. Weis, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form concerning Crandall. Dr. Weis

opined Crandall should be able to lift twenty pounds occasionally and ten pounds frequently, stand and/or walk for about six hours in a normal workday, sit for about six hours in a normal workday, and push/pull without limitations. He opined Crandall could perform all postural functions occasionally, and found her to have no manipulative, visual, environmental, or communicative limitations. In reaching his conclusions, Dr. Weis noted Crandall reported that she could drive sixty to ninety miles at a time, walk for thirty-five to sixty minutes at a time, and stand for thirty to forty-five minutes at a time. She performed "a wide variety of household tasks on a regular basis including laundry, dishes, changing sheets, vacuuming, sweeping, taking out trash, doing some washing of the car, driving every day, grocery shopping and running a number of errands." (A.R. 360) On May 7, 2003, Claude H. Koons, M.D. reviewed the record and concurred in Dr. Weis's findings.

On January 22, 2003, Carole Kazmierski, Ph.D. reviewed the record and completed a Psychiatric Review Technique form concerning Crandall. She found the record to indicate Crandall has severe impairments consisting of affective disorders (specifically dysthymic disorder and history of major depressive disorder) and substance addiction disorders. She opined these conditions would cause Crandall to have a mild degree of limitation in her activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace. She found Crandall had not experienced any episodes of decompensation of extended duration. She indicated Crandall's impairments did not meet Listing levels, and found Crandall's major depressive disorder to be in remission.

On May 5, 2003, Rhonda Lovell, Ph.D. reviewed the record and completed a Psychiatric Review Technique form that differed little from Dr. Kazmierski's evaluation. Dr. Lovell found Crandall would have moderate difficulty maintaining concentration, persistence, or pace. She found Crandall had experienced one or two episodes of decompensation, each of extended duration. In a concurrent Mental Residual Functional

Capacity Assessment form, Dr. Lovell opined Crandall would be limited moderately in her ability to complete a normal workday and work week without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest period.  She otherwise found Crandall would have no work-related limitations from her mental impairments.  Dr. Lovell noted Crandall reported no change in her activities of daily living from the previous assessment, indicating Crandall "cares for four children and regularly does housework, meal preparation, shopping and driving.  She visits family, watches her children's sporting events, reads and manages her own finances." (A.R. 402)  Dr. Lovell observed that although Crandall's mental impairment was severe on occasion, she improved rapidly with treatment.  (*Id.*)

7.     *The ALJ's decision*

The ALJ found Crandall has severe degenerative changes in her low back, but not at a Listing level of severity.  She found Crandall's obesity is not severe.  She further found Crandall's alcoholism, in remission, and her major depressive disorder are not severe.

The ALJ found Crandall's subjective complaints regarding her functional limitations not to be fully credible, given the level of Crandall's daily activities and medical regimen.  She found Crandall to have the following residual functional capacity:  lift twenty pounds occasionally and ten pounds frequently; climb, kneel, crouch, and crawl occasionally; and must "alternate her position every hour."  The ALJ initially stated "the record shows that the claimant is unable to do work she has done in the past." (A.R. 19)  She later stated Crandall "remains capable of her past relevant work as a school bus monitor both as she did the job and as it is normally done and as a child monitor as the job is normally performed." (A.R. 22)  Although these findings are contradictory, the court finds the discrepancy is irrelevant to the ALJ's final determination because the ALJ further found

that even if Crandall could not return to her past relevant work, Crandall still would be able to perform "a wide range of light work," including counter clerk/cashier, room service waitress, hostess, and surveillance monitor. The ALJ therefore concluded Crandall is not disabled.

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits

the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for

providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove

disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo.*" *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987));

*Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)  the claimant's daily activities;
> 2)  the duration, frequency and intensity of the pain;
> 3)  precipitating and aggravating factors;
> 4)  dosage, effectiveness and side effects of medication;
> 5)  functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. DISCUSSION

As noted above, Crandall claims the ALJ erred in presenting an incomplete hypothetical question to the Vocational Expert, improperly determining Crandall's residual functional capacity, improperly finding Crandall's subjective complaints not to be credible,

and failing to give proper weight to the opinions of the medical professionals regarding Crandall's condition.

The court first notes the ALJ issued an extremely brief decision in this case. She did not review Crandall's extensive medical history in any detail; indeed, she barely reviewed the medical history at all in her decision. The ALJ concluded Crandall's mental impairments are not severe based, apparently, solely on the testimony of Dr. Ascheman. The ALJ failed to reconcile Dr. Ascheman's perfunctory opinions with Crandall's lengthy history of depression and mental health issues.

However, the court further notes the record contains no treatment records for mental health issues after October 2003. The record indicates Crandall experienced acute exacerbations of depression on several occasions, sometimes requiring hospitalization. However, the record further indicates that after Crandall resumed taking antidepressant medications and attending individual therapy, her symptoms quickly resolved and she made rapid improvement. As a result, the evidence does not indicate Crandall's depression was disabling for any consecutive twelve-month period of time, a requirement for a finding of disability. *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. The court therefore finds the ALJ did not err in finding Crandall's mental impairments not to be severe.

Regarding her physical impairments, Crandall has been treated sporadically over the past fifteen years for back and neck pain. Until March 2004, each time Crandall injured herself and obtained treatment, she made good progress and her symptoms largely resolved. Notwithstanding the fact that Crandall did not return to any type of full-time employment, her treating doctors released her to work when her symptoms resolved. However, the record indicates that beginning in March 2004, Crandall's pain complaints became more severe, and the frequency and regularity of her doctors' visits and treatments increased significantly. The court finds it notable that the ALJ failed to obtain an updated consulting evaluation of Crandall, given that by the time of the hearing it had been two

years since any physician had completed a functional capacity assessment of Crandall, either from simply a paper review or from a physical examination.

In addition, the residual functional capacity assessment made by the ALJ is insufficient. The ALJ found Crandall can lift twenty pounds occasionally and ten pounds frequently; climb, kneel, crouch, and crawl occasionally; and must be able to change positions every hour. The record evidence supports this RFC determination – as far as it goes. But the ALJ failed to address whether Crandall is capable of walking, sitting, and/or standing for a total period of time that would allow her to work full time. The record contains substantial evidence that Crandall is unable to sit, stand, or walk for extended periods of time, and that after sitting and standing, in combination, for a two-hour period, she would have to take a fifteen-minute break to lie down. With those restrictions, the VE testified Crandall could not return to her past relevant work, and she would be precluded from any type of competitive employment. The court therefore finds Crandall is disabled, and she has been disabled since March 4, 2004.

## IV. CONCLUSION

Having found that Crandall is entitled to benefits, the court may affirm, modify, or reverse the Commissioner's decision with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 405(g). In this case, where the record itself "convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate." *Cline*, 939 F.2d at 569 (citing *Jefferey v. Secretary of H.H.S.*, 849 F.2d 1129, 1133 (8th Cir. 1988); *Beeler v. Bowen*, 833 F.2d 124, 127-28 (8th Cir. 1987)); *accord Thomas v. Apfel*, 22 F. Supp. 2d 996, 999 (S.D. Iowa 1998) (where claimant is unable to do any work in the national economy, remand to take additional evidence would only delay receipt of benefits to which claimant is entitled, warranting reversal with award of benefits).

Accordingly, for the reasons discussed above, the Commissioner's decision is **reversed**, and this case is **remanded** to the Commissioner to calculate and award benefits for the period after March 4, 2004.

**IT IS SO ORDERED.**

**DATED** this 15th day of December, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT